IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>APPROXIMATELY $33,100 IN UNITED STATES CURRENCY SEIZED FROM JOSEPH LASRY ON NOVEMBER 8, 2021 AT THE CHARLOTTE-DOUGLAS INTERNATIONAL AIRPORT | Civil No. 3:22-cv-219 |

## **VERIFIED COMPLAINT FOR FORFEITURE IN REM**

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

### INTRODUCTION

1. This is a civil action *in rem* against approximately $33,100 in United States currency seized from Joseph Lasry on November 8, 2021 at Charlotte-Douglas International Airport (the "Currency") during an interdiction operation conducted by Homeland Security Investigations ("HSI").

2. After a narcotics detection K9 alerted to Lasry's checked bag (which was mostly empty of travel items but did contain marijuana particles), HSI discovered that Lasry was transporting the $33,100 in Currency on his person.

3. Lasry claimed this money was from "free loans" or no-interest loans he had given in New Jersey, and that he was transporting it to California as part of a newly formed stock trading and real estate business. Lasry further told HSI that he

1

had just signed a lease for office space in California and was flying out to pick up the keys.

4. A more plausible explanation of the Currency's source and intended use exists: Lasry was transporting narcotics proceeds to California to purchase additional narcotics there and transport them back to the east coast, indicators of which include, *inter alia*:

- If the Currency was part of a legitimate business, transporting it across the country in cash form made little sense—Lasry could have simply deposited it into his bank account (he has at least one known account at Chase Bank) after he obtained it in New Jersey, and then accessed the Currency at any ATM or Chase Bank location in California. Similarly, Lasry could (much more safely) electronically transfer funds (whether by wire transfer, Venmo, Zelle, CashApp, etc...) to any legitimate business recipient.

- Therefore, the fact that Lasry chose to transport the Currency as cash is, at the very least, probative of an illicit connection and/or a desire to avoid either currency reporting requirements or a paper trial for the Currency. *See, e.g., United States v. $183,791.00 in U.S. Currency*, 391 Fed. Appx. 791, 795 (11th Cir. 2010) ("Although a large amount of cash alone is insufficient to meet the government's burden, it is highly probative of a connection to some illegal activity . . . legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. In contrast, drug rings do often utilize couriers to transport large amounts of cash in rubber-banded bundles.") (internal quotations and citations omitted).

- Lasry's story that he received the cash as part of a "free loan" program is unlikely due to the obvious fact that a "free loan" program is not a viable business model: the lender loses money on a no-interest loan due to the time value of money. Simply put, there is a reason those in the business of lending money—whether they be legitimate banks or loan sharks—charge interest, and Lasry's attempt to explain the Currency's source is implausible.

- A drug detection K9 positively alerted to Lasry's checked suitcase, which was largely empty and contained marijuana particles. Legitimate business travelers do not generally check large empty suitcases while carrying on multiple other bags (filled with clothes, etc...)—and especially do not pay an

2

Case 3:22-cv-00219-MOC-DCK    Document 1    Filed 05/16/22    Page 2 of 15

extra checked bag fee for an empty bag as Lasry did. Thus, it is probable the checked suitcase was intended to transport marijuana or other drugs on the return trip—hence the small marijuana particles found in it (likely the result of a poor cleaning job from the suitcase's prior transportation of marijuana).

- A second drug detection K9 further alerted to the odor of narcotics on the Currency (which was not in the checked suitcase) when it was placed in a blind lineup of scent boxes, and the Currency's denominations where consistent with street-level narcotics transactions.

- California is a known-drug source location, and in the months prior to the seizure, Lasry began traveling to California on what were often last-minute and/or one-way flights—a travel pattern consistent with a drug or money courier.

- At the time of seizure, Lasry gave misleading answers to law enforcement regarding the amount of Currency he was carrying, first stating it was about $20,000, then changing his answer to roughly $30,000 as the search of Lasry's multiple bags continued, and finally revealing he in fact knew exactly how much he was carrying by stating "$33,100" when the seizure receipt was being filled out.

5. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

6. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

8. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

9. The Currency has been seized and is now within the Western District of North Carolina.

10. Based on the following facts, verified by Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent Courtney Roanhorse, this action seeks the forfeiture of all right, title, and interest in the Currency.

## FACTS GIVING RISE TO FORFEITURE

*The interdiction*

11. On November 8, 2021, law enforcement personnel at the Charlotte airport were conducting a narcotics interdiction operation on outbound domestic flights to known drug-source locations, which included American Airlines ("AA") flight 399 bound for Los Angeles, CA.

12. Joseph Lasry was traveling to Los Angeles on AA flight 399 that day.

13. During the interdiction operation, Stallings PD Officer Josh Smith detected the odor of marijuana coming from a cream-colored suitcase on a luggage

cart of checked bags. Officer Smith left the suitcase inside the luggage cart, but notified HSI Task Force Officer ("TFO") Jonathan Cerdan of his observations.

14. TFO Cerdan deployed K9 Cali, a properly trained and certified narcotics detection canine, in an open-air sniff of the luggage cart.

15. K9 Cali positively alerted to the odor of narcotics on the cream-colored suitcase.

16. The suitcase's checked baggage tag indicated that it belonged to Joseph Lasry, and airline records later revealed Lasry paid an additional checked bag fee.

17. Law enforcement transported the suitcase to the boarding area of gate B14, and had the gate attendant page Lasry.

18. Lasry approached the boarding gate just prior to the end of the boarding process, and TFO Cerdan made contact, telling Lasry he was speaking with him because (1) there was a strong odor of marijuana coming from the suitcase that was easily smelled and (2) a narcotics K9 had alerted to it.[1] Lasry also identified the checked bag as his.

19. TFO Cerdan asked Lasry for his ID and asked if he used marijuana, to which Lasry admitted, "once in a blue moon."

20. TFO Cerdan asked Lasry what was in the checked suitcase, and Lasry replied there was clothes and not much else.

21. When asked if there were any large amounts of cash in the suitcase, Lasry responded that there was not in that suitcase. When then asked if he had large

---

[1] The full encounter with Lasry was captured on body-worn camera, for which this Complaint sets forth a general synopsis of the relevant parts.

amounts of cash anywhere else, Lasry indicated that he was carrying "something like 20" (*i.e.* $20,000) in a bag on his person, while pulling on the strap of a green shoulder bag.

22. Lasry stated he was from New Jersey and going to LA for business and had "just signed a lease."

23. When asked what he was doing in Charlotte, Lasry stated he had just been in Dillon, SC, because he was an investor in real estate (Lasry later mentioned he was also in neighboring Florence, SC).

24. Lasry granted consent to search his checked bag, unlocking the bag for TFO Cerdan.

25. The large, checked suitcase was mostly empty:



26. It did, however, contain visible marijuana particles (example below), which Lasry claimed must have fallen off his shoes:



27. TFO Cerdan noted that was "pretty weird huh?" while checking the clean bottom of Lasry's shoes, to which Lasry responded "yeah."

28. In all, the suitcase contained, *inter alia*, on one side a pair of shoes and the marijuana particles and on the other, a large black case (mostly empty) with an empty eye glass case and beard/hair trimmer, a folded plastic happy birthday bag, toiletries, ibuprofen bottle, vitamin bottle, a pair of black pants, black jacket, and belt.

29. When asked if the money Lasry had on him came from a bank, he said that he got it from "a different business deal."

30. Lasry was carrying another plastic bag, which he stated just had "packaging" in it.

31. TFO Cerdan explained to Lasry that he was a part of an HSI team which interdicted drugs coming into Charlotte as well as money going out to source locations, and that was the reason TFO Cerdan was asking Lasry all of the questions.

32. Lasry also had a rubber-banded large wad of cash in a brown leather pouch that he showed TFO Cerdan, and stated was $3,100.

33. When asked if this money came from a bank, Lasry said no, "it came

7

Case 3:22-cv-00219-MOC-DCK   Document 1   Filed 05/16/22   Page 7 of 15

from someone who was giving it to me to bring to my partner."

34. TFO Cerdan then noted that Lasry said he had more cash on him and asked if he could see that. Lasry mentioned it was in a TSA lock box.

35. TFO Cerdan further asked Lasry if he could quickly check the other two small bags Lasry had strapped on him so that Lasry didn't miss his flight. Lasry granted consent, these bags were quickly searched, with nothing of note contained in them.

36. Lasry then pulled out the lockbox from his green shoulder bag. TFO Cerdan asked if the money in the lockbox came from a bank, to which Lasry replied "parts of it."

37. TFO Cerdan followed up with "where did you get it from?" and Lasry responded that it was from some people that owed him money.

38. Lasry stated that, as a relatively new business venture, he loaned people money and "didn't take interest on the loans."

39. TFO Certain asked for consent to look in the lockbox before opening it up, which Lasry granted.

40. The lockbox was full of United States currency banded with non-bank bands in multiple denominations (consistent with street-level narcotics transactions):



41. After TFO Cerdan pointed out the money bands were not bank stamped, Lasry then stated he had no idea if the money in the lockbox came from a bank.

42. When asked how much was in the lockbox, Lasry responded "30" (*i.e.* $30,000"). When TFO Cerdan noted that Lasry had originally told him he was carrying around twenty, Lasry made an approximation hand gesture and said "20, 30..."

43. TFO Cerdan asked Lasry how much he made in a year, to which Lasry replied he was self-employed so it varied. Asked to give a ballpark figure, Lasry said that "this year" he was "wired" something like $650,000 or $700,000 from Israel roughly four months ago.

44. TFO Cerdan confirmed that Lasry was talking about a "wire to him" and Lasry replied, "yeah, to my Chase bank account."

45. Lasry stated he was a lawyer when questioned what his business dealings with Israel were.

46. As Lasry was getting out his phone to show TFO Cerdan this transaction, he stated (in response to Cerdan's queries) that he had bought his plane ticket two days ago, and was going out to LA to get the keys to an apartment that he had just signed a lease on, and the business he was opening there was a part stock trading, part real estate business.

47. Lasry also granted consent to search his other carry-on roller bag, which he stated contained both his and his girlfriend's clothes. Another officer searched this

bag while Lasry continued speaking with TFO Cerdan.

48. Lasry confirmed the Currency did not come from the bank account and/or the wire he was going to show TFO Cerdan, but that this wire was just an example of how much money he was making per year.

49. Lasry showed TFO Cerdan a June 2021 bank account statement on this phone. TFO Cerdan noted that the bank account balance stayed at roughly the same (and much lower) amount, with the roughly $650,000 wire entering and exiting the account in short order.

50. Lasry said he received the wire because he was a "real estate developer."

51. As to the Currency at hand, Lasry reiterated his story that it was from no interest or "free loans."

52. TFO Cerdan explained to Lasry the indicators he had observed that the cash did not have a legitimate source and that further investigation was warranted. TFO Cerdan explained the seizure, petition, and further investigation process to Lasry (*e.g.*, that Lasry would receive a receipt for the seized Currency that day and a petition later in the mail at the address he specified, to which he would respond with source documentation/information). TFO Cerdan further specified that since Lasry was claiming the money was given to him from individuals pursuant to no interest loans, the investigation would also focus on contacting those individuals once identified by Lasry to confirm the story.

53. TFO Cerdan noted that if Lasry could explain the source of the Currency in response to the petition, and HSI's confirmation calls to the purported loan

recipients checked out, the Currency would most likely be returned to Lasry. TFO Cerdan further answered questions Lasry had about the process.

54. Lasry was given a seizure receipt and confirmed his contact information. TFO Cerdan explained that the money would be taken to a bank and counted there, but that Lasry had estimated it was $33,000.

55. At this time, Lasry gave a precise number for the amount of Currency, stating it was $33,100.

56. As Lasry and TFO Cerdan further discussed the seizure and investigation process, Lasry stated that the no interest loans "were a community thing ... a known thing in the community" (being New Jersey); he had brought the money from New Jersey to Dillon, SC; but while he came to SC to look at real estate, the money had no connection with or intended use with regard to his trip to South Carolina.

57. TFO Cerdan offered to help Lasry repack his various bags, to which Lasry responded "I'm good," and the encounter ended.[2]

***The second K9 alert and Currency's deposit***

58. The Currency was then placed in a blind lineup of six scent boxes and presented to K9 Lily, a properly trained and certified narcotics detection canine.

59. K9 Lily alerted to the odor of narcotics in the scent box which contained the Currency.

---

[2] During the encounter, TFO Cerdan also noted that Lasry was free to leave at any time to get on his flight, and checked with the gate attendant as to how much time was left till the doors closed. Lasry indicated that he did not wish to fly without the Currency, and did not board his flight.

60. The Currency was later transported to Loomis, where it was counted and found to total $33,100, consisting of 30 one-hundred-dollar bills, 19 fifty-dollar bills, 1,457 twenty-dollar bills, and 1 ten-dollar bill—a composition consistent with the proceeds of street-level narcotics sales:



61. The Currency was deposited into an account established to hold seized funds.

*Lasry's travel history*

62. In the months leading up to the seizure, Lasry began a travel pattern consistent with transporting drugs or illicit proceeds, purchasing one-way and/or last-minute flights (*i.e.* booked the day before to travel through a few days prior) to California (a known drug source location) while staying only a short amount of time

per trip.

63. Specifically, Lasry did this once a month in August, September, October, and November 2021, with November being the trip underlying the instant Complaint.[3]

### FIRST CLAIM FOR RELIEF – THE CURRENCY
### (21 U.S.C § 881(a)(6))

64. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 63 above as if fully set forth herein.

65. The Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

66. Upon information and belief, the following persons may claim an interest in the Currency seized on November 8, 2021:

Joseph F. Lasry

With courtesy copy to:

Richard G. Huizenga, Esq.
Law Offices of Richard G. Huizenga
67 Main Avenue, 2nd Floor
Ocean Grove, NJ 07756

---

[3] During this time period, Lasry also traveled from New Jersey to Atlanta to Florence, SC with an individual whose criminal history includes charges and/or convictions for terroristic threats, aggravated assault, unlawful possession of weapons, attempted criminal murder, possession of controlled substances (50 grams of marijuana), and manufacturing/distributing/possession with intent to distribute heroin.

## CONCLUSION AND PRAYER FOR RELIEF

67. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 16th day of May, 2022.

DENA J. KING
UNITED STATES ATTORNEY

/s/ Seth Johnson
J. Seth Johnson
NC Bar No. 53217
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 338-3159
Email: seth.johnson@usdoj.gov

## VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 13th day of May, 2022.

_____
Special Agent Courtney Roanhorse
Department of Homeland Security,
Homeland Security Investigations